IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

SANDRA F. ASHLEY,

      Plaintiff,

v.                           CASE NO. 2:07-cv-0689

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the court on cross-motions for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Sandra F. Ashley (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on May 25, 2005, alleging disability as of August 16, 2002, due to back, hip, arthritis, high cholesterol, and depression. (Tr. at 14, 87-89, 134-41, 164-69, 193-98.) The claims were denied initially and upon reconsideration. (Tr. at 14, 49-51, 57-61, 62-64.) On August 21, 2006, Claimant requested a hearing before an Administrative Law

Judge ("ALJ").  (Tr. at 47.)  The hearing was held on April 26, 2007 before the Honorable James P. Toschi.  (Tr. at 31, 516-39.) By decision dated May 16, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14-30.)  The ALJ's decision became the final decision of the Commissioner on August 31, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.)  On October 31, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2006).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is

2

not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of degenerative disc disease of the spine. (Tr. at 17-18.) At the third inquiry, the ALJ concluded that Claimant's impairment does not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 18-28.) As a result, Claimant cannot return to her past relevant work. (Tr. at 28.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as nonpostal mail clerk, video/DVD rental clerk, and cashier, which exist in significant numbers in the national economy. (Tr. at 29.) On this basis, benefits were denied. (Tr. at 29-30.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

4

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 41 years old at the time of the administrative hearing. (Tr. at 28.) She has a high school education and was never in special education classes. (Tr. at 519.) She is a certified nurse's assistant and also obtained a certificate in animal science by mail. (Tr. at 519-20.) In the past, she worked as certified nurse's assistant, a veterinary technician, a camel trainer, a supermarket deli worker, a short order cook, and a truck driver. (Tr. at 521-523, 531-33.)

The Medical Record

Physical

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

5

The record shows Claimant received various tests and treatment at Jackson General Hospital during the period of December 13, 1998, to April 29, 2006.  (Tr. at 337-72.)  An emergency department report dated December 13, 1998, states:  "This is a 37-year old white female who works in a deli.  She states that yesterday while lifting a 5-gallon bucket of icing, she felt a burning pulling sensation in her lower back."  (Tr. at 371.)  Claimant was given 60 mg IM Toradol and 10 mg IM Compazine.  She was diagnosed with lumbosacral strain, discharged, and given a prescription of Naprosyn 500 mg.  (Tr. at 371-72.)

A Jackson General Hospital radiology report dated August 28, 2001 shows claimant had a "pelvic ultrasound...Impression:  Small follicular cyst of the right ovary, otherwise normal study."  (Tr. at 428.) On that same date, Claimant underwent chest and abdomen x-rays which revealed "Chest:... no abnormalities of the heart, lungs, mediastinum or bones.  Impression:  Normal chest... Abdomen: ...The abdominal gas pattern is within normal limits.  There is no evidence of a mass.  There are no stones.  Impression:  Normal abdomen."  (Tr. at 429.)

A Jackson General Hospital emergency department report dated May 23, 2002, states Claimant has injuries to her nose, both knees, and right hip due to "x-boyfriend (sic) was apparently angry with her and pushed her down in parking lot."  (Tr. at 361.)

A Jackson General Hospital emergency department report dated

August 13, 2003, states Claimant's chief complaint is "severe back, rib, leg and pelvic pain." (Tr. at 357.)  A radiology report dated August 14, 2003, diagnoses menstrual pain and states:  "Impression: Small posterior uterine fibroid; otherwise negative pelvic ultrasound." (Tr. at 356.)

A Jackson General Hospital radiology report dated August 20, 2004, for the chest states:  "Comparison is made with the previous exam dated 8/28/01.  The cardiac silhouette is within normal limits.  Lungs are clear.  Impression:  No acute disease." (Tr. at 354.)

A Jackson General Hospital radiology report dated October 29, 2004, for the thoracic spine and lumbosacral spine found no compression fractures and no lytic lesions but noted "[m]ild degenerative change at L5-S1." (Tr. at 350, 423.)

A Jackson General Hospital radiology report dated November 8, 2004, for the chest states:  "Comparison is made with the previous exam dated 8/20/04.  The cardiac silhouette is within normal limits.  Lungs are clear.  Impression:  No acute disease." (Tr. at 345, 424.)

A Jackson General Hospital emergency nursing record shows Claimant was treated on July 18, 2005, for "hyperventilating...patient able to slow breathing with encouragement from staff." (Tr. at 408.)  A UR drug screen of the same dated indicated "Opiates Positive." (Tr. at 416.)

7

A Jackson General Hospital emergency physician record shows Claimant was treated for chronic back pain on July 21, 2005. (Tr. at 420-21.)

A Jackson General Hospital MRI radiology report dated April 29, 2006, for the thoracic spine and lumbosacral spine found:

> (72157) MRI of the thoracic spine with and without contrast:...Impression:    There is no evidence of metastatic disease or focal thoracic spinal cord signal abnormality.   There is no herniated nucleus pulposus. There are degenerative changes at T7-8 which appear chronic and benign with mild degenerative disc changes at T7-8.  (72158) MRI of the lumbar spine with and without contrast:...Impression:    There is a small central and right sided L4-5 disc protrusion as well as a small central L5-S1 disc protrusion with no evidence of a discreet herniated nucleus pulposus or high grade neural foraminal encroachment.

(Tr. at 337.)

The record contains medical notations from Jon Polawich, D.C. dated June 4, 1999, to October 22, 2001, indicating Claimant was treated for low back, mid back, neck, and hip pain.  (Tr. at 228-35.)   A form signed and dated July 25, 2001 by Dr. Polawich identifies Claimant's disability as "Fibromyalgia Syndrome 729.2." (Tr. at 229.)

On September 17, 2001, Claimant had a D&C [dilation and curettage], pelvic laparoscopy, and decompression of the right ovarian cyst by P. Vongsnakorn, M.D. at Jackson General Hospital. (Tr. at 218-27.)

On July 25, 2002, Stephen Nutter, M.D. provided an examination of Claimant for the West Virginia Disability Determination

Division.  Dr. Nutter found Claimant had chronic back pain, chronic lumbosacral strain, and probable posttraumatic and degenerative arthritis.  He found no evidence of rheumatoid arthritis.  (Tr. at 236-40.)  Dr. Nutter reviewed a lumbar spine two view x-ray by Eli Rubenstein, M.D. dated July 25, 2002, which found: "There is minimal narrowing of L-5 S-1.  The rest of the interspaces are normal.  There is no evidence of compression fracture or appendicular defect.  The sacroiliac joints are normal." (Tr. at 241.)

On August 7, 2002, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with the ability to frequently balance, stoop, and kneel, and occasionally climb, crouch, and crawl.  The evaluator found no manipulation, visual, or communicative limitations.  Claimant was found to have unlimited environmental limitations with the exceptions to avoid concentrated exposure to extreme cold, extreme heat, and hazards.  (Tr. at 243-51.)  Fulvio Franyutti, M.D., the evaluator, noted "Patient with back, neck and hip pain syndrome with reduced ROM [range of motion]; all considered and RFC [residual functional capacity] reduced to medium, because of pain and fatigue." (Tr. at 248.)

The record contains Jackson General Hospital records for Claimant's admission on August 26, 2004, through her discharge on August 27, 2004, showing Claimant underwent a laparoscopically

assisted vaginal hysterectomy and bilateral salpingo-oophorectomy. (Tr. at 252-57.) John McMurry, M.D., indicated that Claimant tolerated the procedure well. (Tr. at 254.) Dr. McMurry's pre-operative diagnosis was "chronic pelvic pain unresponsive to conservative management." (Tr. at 256.)

The record indicates Claimant had physical therapy at Jackson General Hospital on November 16, 2004, and December 17, 2004. Claimant missed therapy sessions scheduled for November 18, 2004, and December 3, 2004. (Tr. at 258-59.) Paul Harris, physical therapist, indicates "patient states that she injured her right hip in 1998 when she twisted wrong while at work." (Tr. at 260.) Mr. Harris' plan is for Claimant to attend physical therapy two times a week for four to six weeks for progression of treatment. (Tr. at 261.)

The record shows Claimant received treatment from Robert L. Lewis, II, M.D., a neurologist, at Pleasant Valley NeuroPhysiology Center. (Tr. at 263-69.) A report dated December 29, 2004, indicates that Claimant "has had low back pain since 1998. She told me she lifted a 5-gallon bucket and then turned. There was a sudden onset of pain in her right hip, right low back that radiated down the posterior aspect of her leg." (Tr. at 264, 397.) Dr. Lewis ordered an MRI of the lumbar spine and an EMG. He also prescribed Zanaflex 4.0 and Neurontin 600 mg three times a day. (Tr. at 264.)

10

On January 18, 2005, Claimant had an MRI of the lumbar spine without contrast at Pleasant Valley Hospital, Department of Radiology.  Robert W. Seaman, M.D.'s imaging report states:

> Slight bulging of the annulus is noted at L3/L4 without any significant mass effect.  L4/L5 similarly reveals minimally bulging annulus which is somewhat greater in the right posterior paracentral area.  However, a disc herniation is not seen.  There is no spinal stenosis and no fractures or osseous lesions are seen.  Impression: 1.  Mild bulging annuli at L3/L4, slightly asymmetric right posterior lateral bulging and spurring at L4/L5. 2.  No significant mass effect or disc herniation.

(Tr. at 269.)

In a report dated March 8, 2005, Dr. Lewis stated:

> Her pain is about 50% improved... Her MRI of her lumbosacral spine shows a disc herniation of a protrusion type, which is maximal at the L4/L5 level.  There is no neural foraminal narrowing.  There are some degenerative changes.  Her EMG did not show any evidence of a neuropathy or right lumbosacral radiculopathy.  I have asked her to continue her current regimen.  She says she is unable to follow-up with PT [physical therapy].  I have asked and encouraged her to continue that.  I am going to see her back in approximately four months.

(Tr. at 263, 402.)

The record shows Claimant received treatment at Morad/Hughes Health Center on August 13, 2003, March 5, 2004, and April 4, 2005, for back pain and menstrual pain.  On April 13, 2005, Claimant received treatment for "tailbone pain... fall earlier today on ground." (Tr. at 270-83.)

The record shows John McMurry, M.D. treated Claimant from August 14, 2003, to June 13, 2005. (Tr. at 284-98.) Although the handwritten notes are largely illegible, a progress note dated

11

August 14, 2003, indicates Claimant was referred to Dr. McMurry by the Morad/Hughes Health Center due to pelvic pain. (Tr. at 297.) A pathology report dated September 26, 2003, states: "Clinical history: abnormal pap smear." (Tr. at 298.)

On August 29, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl. The evaluator found no manipulation, visual, or communicative limitations. Claimant was found to have unlimited environmental limitations with the exceptions to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. (Tr. at 299-307.) Fulvio Franyutti, M.D., the evaluator, noted: "The claimant's reported limitations are supported by the evidence; the claimant is found to be credible. DDD with HNP protrusion type, with persistent back pain however there are no motor abnormalities. SLR is negative. EMG is negative for nerve root involvement. Lumbar x-rays show multilevel arthritic changes." (Tr. at 304.)

The record shows Claimant was treated by Kalapala Seshagiri Rao, M.D. on November 18, 2005, for chronic low back pain. The handwritten treatment notes show claimant was prescribed Percocet and had office visits with Dr. Rao on December 5, 2005, January 20, 2006, January 30, 2006, March 2, 2006, March 30, 2006, April 27, 2006, May 24, 2006, June 21, 2006, July 26, 2006, August 23, 2006,

12

September 20, 2006, November 15, 2006, October 18, 2006, January
10, 2007, February 7, 2007, and April 4, 2007.  These notes are
illegible. (Tr. at 373-78, 468-72.)

On January 18, 2005, and January 28, 2005, Shrikant K. Vaidya,
M.D. evaluated and treated Claimant for a history of microscopic
hematuria.  Dr. Vaidya concluded:

> Her IVP showed mild cystocele.  No other tumor or stone
> was seen.  The patient also was cystoscoped and was found
> to have mild cystocele.  No tumor or stone was seen in
> the bladder.  I feel that the patient also has some
> stress incontinence.  She was advised Kegel exercises.
> Her microscopic hematuria could be familial in nature and
> can just simply be followed at this point.

(Tr. at 403-04.)

On July 7, 2005, Robert M. McCleary, D.O. evaluated Claimant
at the referral of Robert L. Lewis III, M.D.  Dr. McCleary made
this assessment: "Degenerative disc disease L3/L4, L4/L5.  Plan:
I have recommended Accu-Spina treatments.  Decadron IM.  A Dexa
pack.  I gave her Lortab 5s one to two b.i.d., and I will see her
back in my office once the treatments are completed...If failure of
treatments is done then pain management is indicated."  (Tr. at
405.)

On August 1, 2005, a General Physical (Adults) form from the
West Virginia Department of Health and Human Services checks "no"
to the questions "Is applicant able to work full time at customary
occupation or like work" and "Is applicant able to perform other
full time work" and states "due to back pain."  The remainder of

13

the form is illegible.  It is signed by James Gaal, D.O.  (Tr. at 406-07.)

On August 16, 2006, a General Physical (Adults) form from the West Virginia Department of Health and Human Services checks "no" to the questions "Is applicant able to work full time at customary occupation or like work" and "Is applicant able to perform other full time work" and states "due to pain in back."  The remainder of the form is illegible.  It is signed by Dr. Gaal.  (Tr. at 395-96.)

On June 29, 2006, Susan L. Garner, M.D., West Virginia Disability Determination Service, examined Claimant.  In a report dated July 12, 2006, Dr. Garner  noted:

> She has not had any surgical interventions thus far to the back.  The pain is constant, aching and tends to radiate from the low back into the right hip and down to the toes.  She has some numbness and tingling of the same area, as well as weakness of the leg.  She also did go to physical therapy for a period of time and says that it did not help.  Dr. Rao did epidural steroid injections and it made the pain worse...
> Impression: 1.  Chronic lumbar pain, degenerative disk disease by history. 2.  Hyperlipidemia, diet controlled.
> Summary:   This is a 45-year old female who has had back pain since 1998.  On her examination today, she did not have any reproducible tenderness over the spinous processes, or paravertebral muscle spasm.  She had pain with forward flexion.  She had a positive straight leg raise test on the right leg.  She was able to stand on one leg at a time, but had to use the table for support.  Strength and deep tendon reflexes were preserved in the lower extremities.  There was no muscle atrophy.  She ambulated without an assistive device.  She did ambulate with a limping gait.  She complained of pain in her back when lying supine.  She was slow to arise from a seated to a standing position, and step up and down from the examination table.  She could heel walk, toe walk, heel-to-toe walk, and squat only using the table for support.

> She also complains of hyperlipidemia.  She is currently
> on dietary management.  I have no further information
> regarding this, but she has no other end organ system
> problems that she knows of.

(Tr. at 379, 382-83.)

On July 18, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work with the ability to occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladder/rope/scaffolds.  The evaluator found no manipulative, visual, communicative, or environmental limitations. (Tr. at 386-94.)  The evaluator, Cynthia Osborne, D.O., noted: "ADL [activities of daily living] limited by back pain.  She is credible.  Findings support decrease in RFC [residual functional capacity] to medium for current and DLI [date last insured] of 9/30/03."  (Tr. at 391.)

The record shows Claimant was regularly treated by James Gaal, D.O. from August 23, 2001, through February 7, 2007 for a variety of symptoms, including pelvic pain, back pain, constipation, insomnia, and tobacco abuse.  (Tr. at 442-66.)

On September 7, 2006, Seyed Abdi Ghodsi, M.D., wrote a letter to Dr. Gaal thanking him for referring Claimant to him for a neurosurgical consultation and recommending she continue conservative measures. However, he stated that if Claimant was anxious to get some relief, a discogram could be performed to see if the degenerative discs are the etiology for her pain.  (Tr. at

15

448-49.)  He reported:

> Lumber spine flexion and extension are obtained and
> compared to previous MRI.  The alignment is fairly well
> preserved.  No fractures or subluxations noted.  There is
> degenerative disc disease, most prominent at the L5-S1
> but also present at the L4-5.  The fo.rament appeared to
> be patent.   There is  no evidence of  instability on
> flexion and extension.   The remainder of the study is
> unremarkable.

(Tr. at 450.)

On November 1, 2006, Peter Pantelidis, M.D. reported that Dr.
Ghodsi had referred Claimant to him for a provocative lumbar
discography.  Dr. Pantelidis stated that he told Claimant of the
risks and benefits of the procedure.   He diagnosed her with
"[l]umbar degenerative disc disease with right sided L4-5 disc
protrusion and small, central L5-S2 disc protrusion."  (Tr. at
437.)

On December 2, 2006, Claimant underwent an L2-3, L3-4, L4-5,
L5-S1 provocative lumbar discography at St. Joseph's Hospital.  The
surgeon, Dr. Pantelidis, diagnosed lumbar discogenic pain syndrome
and reported no complications.  (Tr. at 433-35.)

On December 4, 2006, Dr. Pantelidis reported Claimant's

> pain has improved considerably since the first couple of
> days after her procedure in which it flared up quite a
> bit...Patient is wearing a belt with an ice pack over her
> low back area.  I did give the patient prescription for
> 60 Oxycodone, 5 mg...as needed for pain.  This should get
> her through the rest of her post op pain and I discussed
> with the patient that I will not be giving her any more
> pain medications after this.

(Tr. at 441.)

16

On December 13, 2006, Heidi D. Potts, PA-C of Dr. Ghodsi, reported Claimant had a follow-up examination.  Ms. Potts stated:

> As Dr. Ghodsi has explained to Ms. Ashley since the discogram was positive at so many levels, it will be very difficult to treat this with a fusion because it would require a large four-level fusion surgical procedure.  At this time, we are uncertain if such a surgery would be able to resolve all of her pain.  As Dr. Ghodsi has explained another option down the road may possibly be a spinal cord stimulator; however, Dr. Ghodsi strongly recommends to Ms. Ashley that she should fail all nonoperative modalities before proceeding with surgery. Therefore, we would like for her to see a pain specialist and fail injections before discussing her surgical options.

(Tr. at 445.)

On December 13, 2006, Dr. Ghodsi wrote to Dr. Pantelidis stating:

> I appreciate you performing a discogram on Ms. Ashley. Unfortunately, this was concordant at three levels.  I have tried to explain to her the possibility of a four-level fusion.  Relieving her pain is somewhat low.  I think her best chance of success with surgery is 50%. She has never had deep epidural injections, and I think consideration would be given to doing a trial of that, and other possible intervention would be an IDET procedure.  Should she fail these, then I would consider either a spinal cord stimulator or a fusion.  I look forward to further input from you whether she would be a candidate for any of the above.

(Tr. at 447.)

On February 7, 2007, Erin N. Streula, PA-C of Dr. Ghodsi, reported Claimant had a follow-up examination.  Ms. Streula stated:

> On examination, her strength and reflexes were intact and symmetrical.  Long track signs were absent.  Gait was steady.  Coordination was normal.  She was most tender at L3-4 and L4-5 to the right and left of the midline. Tension signs were absent.  At this time, we discussed

17

with Ms. Ashley that based on her studies and discogram,
in order to potentially offer her some relief, this would
require a multilevel decompression and fusion; however,
we feel her chances of getting improvement are only in
about the 50% range.   We will not consider surgical
intervention until she has had at least six months of
pain management treatment.   We will refer her to Dr.
Lundquist for evaluation and possible injections.   If
this fails to offer her adequate relief, we will be happy
to see her back for follow-up.

(Tr. at 442.)

On February 20, 2007, Anil J. Patel, M.D., board certified in anesthesia and pain management, thanked Dr. Ghodsi for referring Claimant to his pain clinic.  He stated that he examined Claimant on this date and explained to her the benefits of nerve blocks for pain relief.  He stated that he felt he could help the Claimant and that she wished to begin treatment immediately.  (Tr. at 467.)

Psychological

On October 27, 2005, James W. Bartee, Ph.D., a psychologist, provided a case analysis form stating:  "There is insufficient evidence to evaluate claim prior to DLI of 9/3-/2003 (sic)."  (Tr. at 307.)

On October 13, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's affective disorder, depression, was not severe.  The evaluator, James W. Bartee, Ph.D., found that Claimant had no limitations of restriction of activities of daily living or difficulties in maintaining social functioning and only mild limitations of maintaining concentration, persistence, or pace.  There were no

18

episodes of decompensation. Dr. Bartee further found that the evidence does not establish the presence of "C" criteria. (Tr. at 309-22.) Dr. Bartee noted: "Claimant's mental impairments appear to be non-severe based on current MER. Claimant's statements are in general accord with MER and seem credible." (Tr. at 321.)

On April 26, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's affective disorder, depression, was not severe. The evaluator, John E. Damm, Ed.D., CAC, found that Claimant had mild limitations of restriction of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace. There were no episodes of decompensation. Dr. Damm further found that the evidence does not establish the presence of "C" criteria. (Tr. at 323-36.) Dr. Damm noted: "Claimant has no h/o [history of] receiving mental health tx [treatment] for depression, which seems to be a function of her pain. No additional MER except that antidepressant dosage was increased. Symptoms do not seem severe." (Tr. at 335.)

On June 23, 2006, Timothy S. Saar, Ph.D., licensed psychologist, and Sara Wyer, M.A., licensed psychologist, reported in a form to Dr. Gaal that Claimant attended her appointment on that date. They reported Claimant was "no show" for February 24, 2006, March 2006, and June 9, 2006 appointments. The form stated: "Client reports Lunesta has helped remarkably." Notations on the

19

form appear to indicate that based on this evaluation, diagnoses of major depression and anxiety were made, along with recommendations for continuation of current medications, and a return for therapy every one to two months.  (Tr. at 452.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to properly evaluate Claimant's testimonial credibility with the objective medical evidence under the law of Craig v. Chater, 76 F.2d 585, 594 (4th Cir. 1996). (Pl.'s Br. at 11-16.)

The  Commissioner asserts that the substantial evidence supports the ALJ's finding that Claimant's complaints of disabling limitations were not entirely credible.  The Commissioner argues that the ALJ thoroughly analyzed the evidence and the court cannot re-weigh the evidence as Claimant suggests.   (Def.'s Br. at  10-15.)

Credibility Determination

Claimant argues that "the ALJ failed to consider the objective medical evidence contained in the claim, which the Claimant believes supports her complaints of significant and severe low back pain and thus he failed to follow the law in Craig." (Pl.'s Br. at 15.)

A two-step process is used to determine whether a claimant is disabled by pain.  First, objective medical evidence must show the

existence of a medical impairment that reasonably could be expected to produce the pain alleged.   20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).   If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated.   Craig, 76 F.3d at 595.   When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990).   A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4)(2006).   Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)(2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work

activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186, at *2. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to

23

corroborate the extent of the pain. <u>Craig</u>, 76 F.3d at 595. Nevertheless, <u>Craig</u> does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which <u>Craig</u> prohibits is one in which the ALJ rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

In the subject decision, the ALJ thoroughly considered the evidence of record related to Claimant's impairments and concluded that while degenerative disc disease of the spine was a severe impairment, Claimant retained the functional capacity to perform light work. He reasoned that Claimant's subjective complaints were inconsistent with the objective medical evidence and that Claimant's limitations had been correctly established in her residual functional capacity. In his decision, the ALJ addressed the required two-step process in great detail. (Tr. at 17-28.) The ALJ found:

> At the hearing, the claimant testified she injured her middle-lower back at work in 1998 and filed a Workers' Compensation claim; she went to a chiropractor for years, and then to her family doctor, Dr. Gaal, who has given her a lot of medications and referred her to numerous doctors for different procedures, including Dr. Robert Lewis, Dr. McCleary, Dr. Patel, pain management specialist Dr. Rao, and neurosurgeon Dr. Ghodsi. Dr. Ghodsi recommended shots, which she is doing, and said she would need a fusion for three bad discs, but that is the last option because the operation would entail fusion of four discs, which would limit her mobility even more. The claimant testified she has had a discogram; she also saw pain specialist Dr. Lundquist, who said the previous

24

shots were in the wrong places and recommends shots in her hip and knee, instead, and another medication, Cymbalta.

The claimant testified she has trouble sleeping, tossing and turning because of pain; with Lunesta, she can sleep for five good hours; she is tired "all the time"; she has gained 30 pounds in the last four or five years because she cannot exercise much; she is 5'10" and now weighs 192 pounds; she has problems concentrating, as it is hard to think when she hurts so bad.  The claimant described her pain as located mostly across the bottom of her ribs, her hip, and down into her leg; she has pain all the time; it is a constant ache; it gets worse at times.  The pain gets a little better with medications; she takes them first thing in the morning and has to wait about an hour to let the pills work.  The claimant testified she can stand for only about 5 minutes, not long enough to wash dishes; can sit comfortably for a couple of minutes; she cannot bend at the waist, stoop, squat, or go up and down steps comfortably.  The claimant testified she cannot do dishes because she cannot stand at the sink without the pain overwhelming her; cannot vacuum; does not cook much except in a Crockpot; she does not drive much, maybe 5 miles a week, because it hurts to drive; she can lift only a half-gallon of milk, but not a gallon of milk. She takes Percocet, Ibuprofen, Skelaxin, Xanax, and Cymbalta, which cause side effects of dizziness and constipation.

(Tr. at 19-20.)

The ALJ then proceeded to detail the medical evidence, including claimant's treatment and complaints of pain in the next six pages of his decision.  Following this extensive analysis, the ALJ concluded:

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. Although the medical evidence of record shows some mild degenerative disc disease in the thoracic and lumbar

25

spine, with some tenderness to palpation at times, and no
tenderness at other times, the medical evidence of record
also shows no significant neural element compromise and
no cervical spine abnormalities. On physical
examination, neurological examinations are consistently
normal; grip strength, upper extremity strength, and
lower extremity strength are rated at 5/5; straight leg
raising is generally negative; gait is generally normal;
range of motion varies, but is sometimes normal and
sometimes decreased in the lumbar area; an EMG did not
show any evidence of neuropathy or right lumbosacral
radiculopathy; and give away weakness has been noted by
specialists Dr. Pantelidis and Dr. Ghodsi.

The record reflects that the claimant has made
inconsistent statements regarding matters relevant to the
issue of disability. While the claimant testified at the
hearing that she has had pain across the bottom of her
ribs, hip, and down into her leg, all the time, since
1998, that is not what she has told her doctors.
Contemporaneous medical evidence of record shows some
complaints of such pain, but not consistently; sometimes
medications helped the pain, and sometimes she reported
other ailments but not pain; she reported her pain from
the 1998 injury was resolved in 1998; after another
injury in 1999, she reported no pain in 2000; in November
2005, she denied any injury to Dr. Rao, saying she just
noticed the pain one day (Exhibits 2F, 13F & 14F).
Additionally, the claimant has told her doctors that she
has had some relief from pain; e.g., on March 8, 2005,
Dr. Lewis noted her pain was about 50% improved; as late
as February 2007, she denied constant radicular pain and
reported localized low back pain, occasionally in the
medial aspect of the right leg (Exhibits 6F & 25F, page
1). Despite the claimant's testimony that she is tired
all the time, she also testified she sleeps for five good
hours a night with Lunesta, and in June 2006, she told
psychologist Sara Wyer that Lunesta has helped her
remarkably; she is still prescribed this sleep aid
(Exhibits 22E & 25F, page 11). In November 2005, she
told Dr. Rao that she is functionally independent in all
activities of daily living, does housework, and driving
is OK (Exhibit 14F); five months before, in June 2005,
she wrote in a Function Report that she prepares meal
daily, spending a few hours on a meal, and stops to rest
a lot; she dusts and puts the laundry into the washer and
her boyfriend puts the wet laundry into the dryer; she
shops for 30 to 45 minutes when needed; and she could

sit, stand, or lay down for half an hour or so (Exhibit 13E).  In February 2006, she wrote in another Function Report that she prepares food weekly, for an hour and a half to two hours; occasionally does dishes and dusting, when the pain permits; and her hobbies are TV, movies, sewing embroidery, crosswords, reading, talking on the phone, and using a laptop computer (Exhibit 19E).  Yet at the hearing, she testified it hurts to drive, she cannot even wash dishes because she cannot stand for 5 minutes without overwhelming pain, and she can sit comfortably for only a couple of minutes.

The claimant's description of the severity of the pain has been so extreme as to appear implausible.  If the claimant's testimony were wholly credible, it would indicate a complete failure of treatment; yet numerous specialists have recommended conservative treatment; indeed, two neurosurgeons and an orthopedic surgeon have opined that surgery is not recommended (Exhibits 18F, 20F & 25F).  Moreover, the medical evidence shows the claimant has failed to comply with some recommendations, such as physical therapy in November 2004, which suggests the symptoms may not have been as serious as alleged in this application and appeal.  Furthermore, the record includes evidence suggesting that the claimant has at times exaggerated her medical condition to her physicians; e.g., she reported she had cervical and uterine cancer (Exhibits 13F, page 1 & 25F, page 1), but when she had a hysterectomy in 2004, her surgeon noted she had some parakeratosis, leukoplakia, opined to be possible endometriosis on her cervix, possible endometriosis involving the right ovary and the broad ligament on the right; and possible uterine fibroids, none of which equate to cancer; and a laboratory report affirmatively showed no evidence of uterine malignancy (Exhibit 5F, in particular page 6).  While this does not speak directly to the issue before the undersigned, it is some evidence to be considered in evaluating the claimant's credibility in reporting her pain due to her back impairment to doctors and at the hearing.

A review of the claimant's work history shows that the claimant has a work history prior to the alleged disability onset date of low-paying jobs, never earning more than $3,400.00 yearly since 1986, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. Another factor influencing the conclusions reached in

27

> this decision is the claimant's generally unpersuasive
> appearance and demeanor while testifying at the hearing;
> it is emphasized that this observation is only one among
> many being relied on in reaching a conclusion regarding
> the credibility of the claimant's allegations and the
> claimant's residual functional capacity.
>
> Upon consideration and evaluation of all the evidence of
> record, the undersigned has reduced the claimant's
> residual functional capacity to a light exertional level
> with the additional postural and environmental
> limitations specified above.

(Tr. at 26-28.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's subjective complaints of pain, the court finds that the ALJ properly weighed Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

In his decision, the ALJ determined that Claimant had a medically determinable impairment that could cause her alleged symptoms. (Tr. at 26.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 18-28.) The ALJ explained his reasons for finding Claimant not entirely credible, including the objective findings, the

28

largely conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform light work, and her broad range of self-reported daily activities. (Tr. at 27-28.)

While Claimant takes issue with the ALJ's "assertion that she exaggerated her medical conditions on the basis that she had cervical cancer," the court finds that this was not an unreasonable analysis on the ALJ's part as the record regarding the claim of cervical cancer is not clear.  (Pl.'s Br. at  14.)

The same is true of the ALJ's consideration of Claimant's work record.  The ALJ did not err in stating that Claimant's earnings record shows that she has not earned "more than $3,400.00 yearly since 1986." (Pl.'s Br. at  15; Tr. at 27.)  The earnings record shows that while Claimant earned $6,279.21 in 1986, she has not made more than $3,400.00 since 1986.  (Tr. at 78.)

Finally, Claimant takes issue with the ALJ's comments about her appearance and demeanor at the hearing, stating:  "The Judge goes into no detail whatsoever as to how he arrived at that conclusion and thus, the Claimant contends there is nothing in the record to support that contention, as well." (Pl.'s Br. at  15.) The court finds the ALJ, as the finder of fact, is given discretion in making credibility findings. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984)(stating that because the ALJ "had the opportunity to observe the demeanor and to determine the

29

credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight"). Therefore, the ALJ did not err in making vague observations of the Claimant's appearance and demeanor at hearing.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is **DENIED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER:  March 30, 2009

Mary E. Stanley
United States Magistrate Judge

30